## Morgan *vs.* Dudley.

APPEAL FROM FAYETTE CIRCUIT.

Case 35.

ORD. PET

18bm693
111 347

1. No judicial officer, however low his grade as such, is liable to suit for a judicial opinion, however erroneous it may be, if it be not influenced by improper motives. (4 *Bibb*, 28.)

2. No action can be maintained against the "judges of elections, whose ' functions are to some extent judicial, for refusing to receive a ' vote, without allegation and proof that they were influenced by ' bad motives, and decided contrary to their own honest convic- ' tions of what was right and proper."

3. A sheriff, whose duty it is to decide on the qualification of voters, where the two judges disagree in regard to the qualification of voters, acts judicially.

4. The allegation in a petition, against a sheriff who refused to per- mit the plaintiff to vote when he had a right to vote, " that the ' defendant knowingly and wilfully, with an unlawful intention, ' refused to receive the plaintiff's vote," shows a good cause of action.

5. The act of naturalization, as it is required to be performed by the act of congress, is a judicial act, (*Spratt vs. Spratt,* 4 *Peters,* 393;) and congress cannot authoritatively confer jurisdiction on state courts or compel its exercise. (*Huston vs Moore,* 5 *Wheaton,* 27, which was a criminal case; *Haney vs. Sharp,* 1 *Dana,* 442.)

6. The authorities on the subject of jurisdiction conferred on state courts by congress seem to be, " that in judicial matters the con- current jurisdiction of the state courts depends upon the pleasure of congress in every case in which the subject matter can consti- tutionally be made cognizable in the federal courts, and that the state courts will, in *civil actions,* unless prohibited, retain a con- current jurisdiction in all cases where they had jurisdiction origi- nally over the subject matter. (1 *vol. Kent Com. side page,* 400.)

7. Although congress cannot compel state courts to exercise a jurisdiction which it may confer, and for the performance of which they have an adequate inherent jurisdiction, yet if the state courts do exercise the power, it is a valid act.

8. Every *court of record*, whether of a state or of the United States, having *common law jurisdiction*, is fully competent to perform every act which is necessary to be done in the process of naturalization, as state courts may authorize the officers of other states to do certain acts, as taking depositions, &c , which, when done in conformity with the power conferred, is valid.

9. The fact that state courts have for a long period of time exercised the power of naturalization, is a strong argument in favor of its exercise, especially as its legality has been repeatedly recognized. (*Campbell vs. Gorden and Wife*, 6 *Cranch*, 176; *Starke vs. Chesapeake Ins. Co.* 7 *Cranch*, 470, in which persons naturalized were adjudged to be citizens; 5 *Leigh*, 740; 1 *Hill*, 141; 18 *Barbour*, 444; 5 *English Ark. Rep.* 621.)

10. Such state courts as are designated by the act of congress have the power to naturalize foreigners under that act of congress, and are so recognized by our *Revised Statutes, page* 172.

11. The Lexington city court being a court of record, having a clerk and seal, and being vested with a limited common law jurisdiction, has authority to admit aliens to citizenship.

12. Foreigners who have resided in the state, county, and precinct the length of time required by the constitution, are entitled to vote immediately upon being naturalized.

[The facts of the case are set out in the opinion of the court.—Rep.]

*Charles B. Thomas*, for appellant—

This case presents to the consideration of the court three questions: Is the action maintainable? Have state courts, including the Lexington city court, authority to naturalize foreigners? And can a naturalized citizen, with other qualifications complete, vote *immediately* after he is admitted to citizenship?

That section of the constitution of Kentucky which prescribes the qualifications of voters, creates a vested right and invests a qualified voter with a legal franchise. It is a maxim of the law that "where there is a right, there is a remedy for the infringement of that right," nor is it necessary that any special pecuniary injury should be alleged—the slanderer, for instance, is amenable to the law

and liable in a civil suit, although he may not have impaired the fortune of his victim; he is liable simply for impairing the reputation 'and affixing a stigma to the name of another, or for depriving him of his right to a good name. But it is contended here that the appellee is exempt from liability to a civil suit because he acted as a judicial officer. It is perfectly clear that his duty was not *judicial* but *ministerial*, and he can with no more propriety be styled a judicial officer than a sheriff who takes bail, or an assessor who values property—each of whom has power to administer oaths, hear witnesses, and decide by applying law to facts, and yet they are declared to be ministerial officers by the constitution. (See 6*th article*.)   There can be no judicial officer in this state unless appointed or created in the mode prescribed in the 4*th article of. the constitution*, which declares that the judicial power shall be vested in certain courts, and such others as " the general assembly may establish."   They have not thus established an election poll as a court—no where in the law is it thus spoken of—and of course the officers of an election are not judicial.   I am sustained in this position by the decision in *Jarman vs. Patterson*, 7*th Monroe*.   Without the litigants which Blackstone tells us is essential to every court, they have not even the poor power to protect themselves from insult, by punishing for contempt, a power which he again tells us is inseparably incident to every judicial tribunal.   But he is liable even as a judge, because the petition charges that he maliciously decided wrong with a corrupt intention; and he is liable in any event if he decided wrong and against the plain provisions of the constitution—it is an instrument that he is bound to know—such is the decision in the case of *Ely vs. Thompson*, 3 *Marshall*.     It has been frequently decided that the officers of an election are liable to a civil action for refusing a legal vote.   (See *Ashby vs. White, reported in* 2*d Raymond; Lincoln vs. Hapgood*, 11 *Mass. 'Rep*. 350; *Os-*

*good vs; Bradley, 7th Greenleaf,* 411; *Blanchard vs. Stearnes,* 5th *Metcalfe,* 298; *Henshaw vs. Foster,* 9 *Pick.* 312; *Carter vs. Harrison,* 5th *Blackford,* 138.) The right of action is so clearly established that I proceed to the consideration of the second question in the case. Is the Lexington city court, or any other state court, legally empowered with authority to naturalize foreigners? A reference to the act creating that court will show that it possesses all of the requisites mentioned in the act of congress upon the subject of naturalization; but the appellee contends that the act of congress is a nullity, and that it is unconstitutional. The act was passed under power granted to congress in the constitution ·to " establish an uniform rule of naturalization," and under the grant of power in the same article, " to make all laws which may be necessary and proper to carry the foregoing power into execution." It is perfectly clear that the last mentioned grant of power confers upon congress the right to select any means they chose in exercising the power to " establish a rule of naturalization." Story, in his commentaries on the constitution, says that, "in the interpretation of a power all the ordinary and appropriate means to execute it are to be deemed a part of the power itself." (See *Book* 3d, *chapter* 5th, *sec.* 430.) Again, in the 432d *section of same book and chapter,* he says, " in the practical application of govern-
' ment, the public functionaries must be left at lib-
' erty to exercise the powers with which the people
' by the constitution have entrusted them. They
' must have a *wide discretion* as to the choice of
' means; and the only limitation upon that discre-
' tion would seem to be that the means are appro-
' priate to the end. If the end be legitimate, and
' within the scope of the constitution, all the means
' which are plainly adapted to that end, and which
' are not prohibited, may be *constitutionally employed* to
' carry it into effect."

Chief Justice Marshall, in *McCulloch vs. Maryland,* *4th Wheat,* 316, says, "It must have been the intention of those who gave these powers to insure their beneficial execution. This could not be done by confiding the choice of means to such narrow limits as not to leave it in. the power of congress to adopt any which might be appropriate, and which are conducive to the end." His reasoning is so clear, and his illustrations so forcible, as to leave no doubt on the question. I refer the court to his entire opinion, and also to the case of *United States vs. Fisher,* *2d Cranch,* 358. The same point is clearly stated by the supreme court in the case of *Hunter vs. Martin,* 1 *Wheaton,* 326, where the court says, "hence the powers of the constitution are expressed in general terms, leaving the legislature from time to time to adopt its own means to effectuate legitimate objects, and to mould and model the exercise of its powers as its own wisdom and the public interests should require."

There is no higher authority upon questions of constitutional law than the Federalist, and on *page* 380 of that work we find this language: "To confer upon the existing courts of the several states the power of determining such causes would perhaps be as much to 'constitute tribunals' as to create new courts with the like power." Such is the language used in regard to the power of the federal government to constitute tribunals inferior to the supreme court. Again, on *page* 386, "but this doctrine of concurrent jurisdiction is only clearly applicable to those descriptions of causes of which the state courts have previous cognizance. It is not equally evident in relation to cases which may grow out of and be peculiar to the constitution to be established; for not to allow the state courts a right of jurisdiction in such cases can hardly be considered as the abridgment of a pre-existing authority. I mean not, therefore, to contend that the united states, in the course of legislation upon the objects entrusted

' to their direction, may not commit the decision of
' causes arising upon a particular regulation to the
' federal courts solely, if such a measure should be
' deemed expedient. But I hold that the state courts
' will be divested of no part of their primitve juris-
' diction further than may relate to an appeal; and
' I am even of opinion that in every case in which
' they were not expressly excluded by the future acts
' of the national legislature they will of course take
' cognizance of the causes to which those acts may
' give birth. This I infer from the nature of judiciary
' power, and from the general genius of the system.
' When, in addition to this, we consider the state gov-
' ernments, and the national government as they
' truly are, in the light of kindred systems, and as
' parts of one whole, the inference seems to be con-
' clusive that the state courts would have a concurrent
' jurisdiction in all cases arising under the laws of
' the union, where it was not expressly prohibited."
And again, on *pages* 125 and 126, " the plan reported
' by the convention, by extending the authority of
' the federal head to the individual citizens of the
' several states, will enable the government to em-
' ploy the ordinary magistracy of each in the execu-
' tion of its laws. It is easy to perceive that this
' will tend to destroy, in the common apprehension,
' all distinction between the sources from which they
' might proceed, and will give the federal govern-
' ment the same advantage for securing a due obe-
' dience to its authority, which is enjoyed by the
' government of each state; in addition to the influ-
' ence of public opinion which will result from the
' important consideration of its having power to call
' to its assistance and support the resources of the
' whole union. It merits particular attention in this
' place that the laws of the confederacy, as to the
' *enumerated* and *legitimate* objects of its jurisdiction,
' will become the *supreme law of the land*, to the
' observance of which *all officers*, *legislative*, *executive*,
' and *judicial*, in each state, will be bound by the

' sanctity of an oath. Thus the legislatures, courts, ' and magistrates of the respective members will be ' incorporated into the operations of the national ' government as far as its just and constitutional au- ' thority extends, and it will be rendered auxiliary ' to the enforcement of its laws." Again, on *page* 220 *of same work*, James Madison, in speaking of the supposed danger from the power of the union to the states, after showing that state officers will be more numerous than those in the employ of the general government, and those of the state entrusted in many instances by the federal government, says, "indeed ' it is extremely probable, that in other instances, ' particularly in the organization of the *judicial* ' power, the *officers* of the *states will be clothed* with ' the *correspondent authority of the union."*

These extracts furnish us with a contemporaneous exposition of the law which ought not to be lightly regarded. Indeed, the act of congress,.upon natu- ralization was passed when many of the eminent men who had taken a principal part in the conven- tion which framed the constitution were in congress, and when Washington, who was president of the convention, was president of the United States. The act is thus the expression in fact that those men who made the constitution believed the act to be consti- tutional. It is not an obscure law, but one that has been acted upon from the foundation of the govern- ment to the present time. With regard to the effect of long continued exercise of a practice believed to be legal, although it may not have been judicially decided, the supreme court in the case of *Stuart vs. Laird* 1 *Cranch*, 299, says, " to this objection, which ' is of *recent date*, it is sufficient to observe, that *prac-* ' *tice* and *acquiescence* under it, for a period of several ' years, *commencing* with the *organization* of the *judi-* ' *cial system*, affords an *irresistible answer*, and has in- ' deed *fixed* the *construction*. It is a *contemporary in-* ' *terpretation* of the *most forcible nature*. This practi- ' cal exposition is too *strong* and obstinate to be sha-

' ken or controled. Of *course* the *question* is *at rest*
' and *ought not now to be disturbed.*"

But it may be contended that the conference of
jurisdiction upon the United States courts excludes
the state courts from the exercise of authority.  Such
is not the case, unless there is an express prohibition
of the exercise of state authority, or something in
the nature of the subject which prevents it; a famil-
iar instance is found in the grant of jurisdiction to
the federal courts of all suits between citizens of
different states.  This has never prevented the state
courts from entertaining jurisdiction over such of
those who voluntarily litigate their rights before
them—their judgments in such cases are undoubted-
ly valid, and their judgments in issuing certificates
of naturalization are equally so.  No where is the
exercise of state anthority prohibited if the state of-
ficer voluntary chooses to exercise it.  It may be
that congress *cannot compel* the state officer to enter-
tain jurisdiction—such is not the question—but there
can be no doubt that he may, if he choose, perform
an act for government which does not conflict with
his duties to the state or his oath of office, a part of
which is to "support the constitution of the United
States."  Under the fugitive slave act of 1793 the
state magistrates exercised jurisdiction, and when
the question under that act came before the supreme
court of the United States Judge Story, in giving the
opinion of the court, said, "as to the authority so
' conferred upon the state magistrates, while a dif-
' ference of opinioh has existed and may still exist
' on the point in different states, whether state mag-
' istrates are bound to act under it, *no doubt* is *entertain-*
' *ed by this court* that *state magistrates* may, *if they choose,*
' exercise that *authority,* unless prohibited by legis-
' lation."  If such be the law it settles this case, but
the same court has directly decided that state courts
have power to naturalize.  In the case of *Campbell*
*vs. Gordon,* 6*th Cranch,* 176, a foreigner naturalized
by a state eourt was held to have been "duly natu-

ralized." A decision to the same effect is found in
*Stark vs. Chesapeake Insurance Company*, reported in
*7th Cranch*. The same has been uniformly held in
the state courts. (See *Commonwealth vs. Towles*, *5th
Leigh*, 743; *McDaniel vs. Richards*, 1 *McCord*, 177;
*Ex parte Granstein*, 1 *Hill*, 141; *John Clarke's case,
18th Barbour*, 444.) In *Ex parte Gladhill*, reported in
*8th Metcalfe*, 168, it is decided that the police court of
Lowell has authority to administer the first oath to
an alien. In the *State vs. Penney*, reported in *5th Eng.*
621, the court says, "there can be no doubt as to the
rightful jurisdiction of the state courts in such cases,
until extinguished by some act of congress, and such
appears to have been the universal understanding
upon this point." Conkling, in his treatise on the
courts of the United States, and Kent, in his Com-
mentaries, both maintain the same position, and
there is not a single decision to the contrary. The
action of state officers under federal authority is of
frequent occurrence in taking depositions for federal
courts, and in arresting, imprisoning, and bailing of-
fenders against the laws of the United States. The
military arm of the government gathers its strength
from this aid from the states, and would be paralyzed
but for that spirit of amity which prompts state offi-
cers in the apprehension of deserters from the Unit-
ed States army. But the appellee contends that grant-
ing naturalization is a judicial act. A judicial act is
one that is performed judicially. How is an act judi-
cially performed? the answer is, by the aid of judi-
cial power. Then how is this power obtained? The
answer is, from some source competent to confer it,
and if not obtained from a source competent to con-
fer *judicial power* the act is not judicial. The result
is, that if congress can confer *judicial power* upon the
state courts then their action under that power is ju-
dicial, but if not, then their action is not judicial; so
it amounts to nothing. But it is a matter of perfect
indifference whether naturalization is a judicial act
or not—*it is not necessarily so* since congress could

MORGAN
*vs.*
DUDLEY.

prescribe any mode, as that an alien should register his name, or do any other act; and even if it is not valid *as a judicial act*, congress has power to make it valid *as a naturalization act*, and has so made it, and thereby conferred citizenship. But I contend that the act of the Kentucky legislature, declaring "who is a citizen," recognizes the validity of the act of congress; that act declares that all "free white persons naturalized under the laws of ' congress, who may be or become residents of this ' state, shall be citizens." This settles the entire question of jurisdiction, as it meant *the existing laws* in using the language "the laws of congress." The constitution of Kentucky, too, declares that "the Lex- ' ington city court shall remain with its present pow- ' er and jurisdiction until otherwise directed by law." It must have been known to the convention that formed the constitution that the court exercised jurisdiction in naturalizing foreigners, and they thus affirmed the legality of it. The jurisdiction of state courts and of the Lextngton city court thus stands securely fortified by a long continued acquiescence, involving all of the requisites of a custom—by the provisions of both federal and state constitutions, by the acts of congress, and the state legislature, by judicial decisions of both federal and state courts—and awaits but the judgment of the highest tribunal in this commonwealth to restore the appellant to the undisturbed exercise of all his rights as a citizen. "Obstructing the naturalization laws" was one of the complaints against the king of Great Britain, enumerated in the declaration of independence, and it will again be declared to be a wrong that ought not to be tolerated.

The third question will be decided instantly. I presume it to be more like a cavil than a serious question of law. Can a naturalized citizen, with other qualifications complete, vote *immediately after* he is admitted to citizenship, or must he have resided in this state the prescribed time *as a citizen?* The sec-

tion of the constitution which prescribes the qualifications of voters employs the same language used in the old constitution. The makers of it knew the construction which had been placed upon it for fifty years, and they did not intend to change that construction, or they would have changed the language. The sections which prescribe the qualifications of *officers* all require a longer residence and more mature age than in the case of the voter, and yet they require only *citizenship at the time of election.* It is hardly possible that it was intended to require *higher qualifications* in regard to *age* and *residence*, and then be less exacting in regard to the duration of citizenship. The legislature of Kentucky evidently did not contemplate the construction contended for by the appellee. The *9th section of the 12th article of Revised Statutes* prescribes a penalty for frauds upon the ballot-box; it punishes the man who votes the *day before* naturalization, but says nothing about him who votes *the day he is naturalized;* it is evident that they thought he had more rights *the day after* than the day before naturalization. "Every free white male citizen of the age of 21 years who has resided," is said ˑto mean who has *resided as a citizen;* and if this be so, it follows, as a matter of course, that he "has resided as a free white male adult citizen," which reduces it to the absurdity of requiring a voter to be *twenˡtytwo* or *twenty·three* years old—every voter knows that such is not the law. The constitution, in using the word *resided*, only intended to require an identification with the community. If I say "every resident of Kentucky who has resided in Virginia," I certainly violate no rule of grammar, and would not be understood to mean that the same person had been a resident of both places at the same time. If a law should prescribe that "every father who *has learned* to write shall teach his child," I presume no one would suspect that he who had learned *before* he became a parent was exempt. The popular meaning of words is so much more regarded in courts than the gram-

matical construction of sentences, that I do not deem it necessary to tire the court with an essay upon the proprieties of language.

*George Robertson*, for appellee—

Two important questions are brought up for the first time in this court. 1st. Has a state court constitutional authority to grant a certificate of naturalization to a foreigner. 2d. Under the constitution of Kentucky, has a naturalized foreigner a right to vote until one year's residence *as a citizen?*

1. Tested by the object of delegating to Congress the power to make citizens of foreigners, that power cannot have been retained, or be concurrently exercised by a state, but must be admitted to be exclusively in the United States; and, though it was, before about 1816, said by some of the judges of the supreme court, and was probably held and considered by all of them, to be a concurrent power, yet there can be no doubt that the opinion thus intimated has been since 1816 overruled; and now the exclusiveness of the power will not be denied by any jurist, and seems to be universally conceded.

It is equally clear and well settled that the process of naturalization is *judicial* in its character, and has been so stamped by the act of congress of 1802, purporting to confer jurisdiction on state courts. Consequently, the power being exclusive, and the process being *judicial*, the judiciary of the United States must, necessarily, have exclusive jurisdiction according to the supreme law of the land; and, on this inevitable hypothesis, there can be no doubt that congress had no constitutional authority to alienate or make concurrent a power which the people of the states, for wise ends, vested exclusively in their general government. Nor can any sound constitutionalist deny or doubt that a concurrent exercise of the power by a state or its judiciary would tend to frustrate the objects for delegating it to the government of all the people of all the states.

The only judicial decisions relied on as recognizing the constitutionality of the act of 1802, are two short cases in Cranch, and one in a Virginia reporter, and one in Arkansas. But, in neither of them, except the Arkansas case, was the question alluded to by the bar or the court. And in each and all of them, except that case, it is evident that it was not considered. But had it been judicially considered and decided, as claimed by the appellant, those decisions would not have been authoritative or even argumentative, because, when they were rendered, the opinion prevailed, without due consideration, that the states and their courts had concurrent jurisdiction, and therefore the act of 1802, conceding to the state courts a concurrence of jurisdiction, would have been constitutional, and, with assent of a state, might therefore be exercised by its courts.

And, as the constitution provides for the judiciary of the United States, and defines its jurisdiction, and as the state courts derive their jurisdiction from their states alone, it is clear, and has often been decided, that congress cannot make a state judge a federal judge, any more than a state legislature can make a federal judge a state judge.

There is no analogy between a legislative act of one state authorizing depositions to be taken before justices of another state, and the question and case before us—for the taking of depositions is not a judicial act, and a state may allow them to be read if taken before a private person, or in any mode it may choose to prescribe. But could the legislature of Kentucky give jurisdiction to any court in Ohio to decide for Kentucky on its own constitution? Certainly not. Why? Because, to bind Kentucky, her constitution gives, exclusively of every other state, jurisdiction to the Kentucky courts, and the legislature cannot alter the constitution.

Of the Arkansas case I will only say, that I. know nothing about the court, and feel quite sure that if it decided right, its reasons were wrong or insufficient.

MORGAN
vs.
DUDLEY.

The question therefore is open and free—not even embarrassed by argument or presumption, from the fact that congress passed the act of 1802; for congress, like the courts, then did not consider the power and jurisdiction exclusive, as it is now settled and conceded to be.

Nor is there any thing in alledged prescription as some evidence of a recognition of concurrent jurisdiction, because there is, in this case, no proof of any such prescription. Nor can this court have judicial knowledge of it, nor does it appear that the question was ever raised or considered before, unless in the Arkansas case.

Then I respectfully ask this court to decide this great and undecided question just as it would have done only one year after the inauguration of the federal constitution. And so deciding, how can it say that an exclusive power can be made concurrent without a change of the constitution?

2. In prescribing the qualifications of the electors and of the elected, the constitution of Kentucky requires citizenship as indispensable in each class of cases; but as to residence it makes a plain and essential distinction between them, providing as to electors, that "every free male *citizen* who at the 'time being, hath attained to the age of twenty-one 'years, and resided in the state two years, or the 'county or town in which he offers to vote, one year 'next preceding the election, shall enjoy the right of 'an elector;" and providing, as to the elected, that "no *person*" shall be eligible, "who at *the time of his* '*election*, shall not be a citizen and have resided" a prescribed time. .

This diversity is urged by the opposing counsel as conclusive proof that the constitution intended the same thing as to the *status* of the resident, and that therefore, as the constitution is express that a person, to be elected, need not be a citizen *until the election*, and therefore his previous residence is not required to be in the character of a citizen, consequent-

ly the same construction should be given to the clause as to electors providing that "*every citizen* who has resided," &c., may be an elector. This is a *nonsequitur*, and is strong corroborative proof that the constitution intended that, to be entitled to vote, it is not sufficient that the "*person*," as prescribed for the elector, "shall be *a citizen at the time of the election*," but that, as a "citizen," he shall have resided the prescribed time before the election. Why else was such essentially different language used in the two classes of cases? Why, in all the various provisions prescribing qualifications for representatives, senators, governors, judges, &c., did the constitution say that "*no person*" shall be eligible unless he be *a citizen at the time of the election*, and shall have previously resided in the state a prescribed time—and in the only clause as to voters say "every *citizen*" "who has *resided*" the prescribed period, instead of repeating the provision so often echoed as to the elected—every "*person who* has resided," &c., and is a "*citizen at the time of the election*"? The only legal or grammatical answer is that, in the one class of cases, it was intended to couple residence and citizenship as co-extensive elements, and in the other to require *personal* residence before the election and citizenship only at the time of the election,—in other words, to require, in one case, that the *person* shall have resided, and, in the other, that the *citizen* shall have done so. And independently of this express and significant diversity—was there not good reason for requiring of foreigners, as well as of *citizen* emmigrants, some probationary residence in the character and on the responsibilities of citizens? Would the constitution be equal or consistent if it did not apply to natives a rule as favorable as that applied to naturalized foreigners? And why is a native citizen of another state, or even of our own state, after changing his domicil, required to reside here *as a citizen*, two years before he can vote? To assure his fidelity *as a citizen* exercising sovereign power. And does not the same

and a stronger reason apply to an alien born? Should not his probationary residence be also in the character and under the responsibilities of a citizen? Had the constitution given the right of suffrage to free negroes, would a black man, who had been born a slave in Kentucky and resided no where else, be entitled to vote the day after his emancipation? He would be a citizen " at the time of the election," and he had resided here not only two, but twenty-two years—but in what character did he reside? In *his* case, had a " *citizen* resided" here two years? And could there be a doubt that he would not be entitled to vote? And if he would be, why is a residence of two years required? Or if, instead of " *citizen,*" the constitution had said " every *freeman* who has resided," &c., would it not be universally construed to mean that the residence must, all the time, be that of a freeman? And why should not the same provision and policy apply to the residence of all other classes of electors?

: Our opponents catch at a straw when they argue that, if the residence must be by a citizen, it must also be by an adult. My answer is, that an infant being a citizen, his residence was that of a citizen, and requiring such a citizen, after such a residence, to be twenty-one years old does not mean that his residence should have been that of an adult any more than a property qualification would mean that such superadded qualification should have accompanied the two years residence. Infancy, like want of property, when property is required as a disqualification—and legal maturity, like property when required, is one qualification—residence is another—citizenship is another—all must concur at the election—but the residence and citizenship alone must concur before the election. Who is it that the constitution requires to have resided two years? Not an adult—but a citizen. It provides express, that a citizen, who *at the time being*, that is election, has attained " twenty-one years of age and resided in the

state two years"—then the voter, when he votes, must be twenty-one years old, and have previously resided two years—and, of course, if he had resided two years, it is immaterial when he became twenty-one. It is obviously not the adult that must, *as such*, have resided, but the *citizen* as citizen. And to afford an assurance of fidelity in the sovereign voter whose right to vote, the majority have no control, it was important to require not only that he be a citizen, but that he had resided as such in the state two years. But, as the people might safely trust themselves with the utmost freedom of choice in selecting their public agents, and the majority control the choice, the only restriction deemed proper on their discretion, so far as citizenship is concerned, is that they shall choose no person that is not a citizen. And many doubt whether any restriction as to residence or age, ought to have been imposed on the liberty of choosing representatives. And hence there was good reason for requiring, as the constitution expressly does, a voter not only to be a citizen but to have resided as a citizen, a prescribed time; and not only does that reason not apply to the people's agent, chosen by themselves, but to circumscribe their choice to those who had been citizens two years would be unnecessary and unreasonable. And therefore, in that case, the constitution expressly authorizes the people to choose a citizen without regard to the time he has been such.

Whether, then, we consider the letter, the grammar, the object or the analogies of the constitution, we insist a foreigner is not entitled to a vote until he shall, after he became a citizen, have resided two years, or one year, as the case may be, in the state or county in which he offers to vote. I know of no usage to the contrary. Does the court? How derived? The question was never seriously considered, or decided by any judicial tribunal.

Judge Simpson delivered the opinion of the court.

Morgan brought this action against Dudley for denying him the privilege of voting, at the last August election, in the city of Lexington, at the election precinct in which he resided. He alleged, in his petition, that he was a free white male, above the age of twenty-one years, and had, previous to his application to vote, continuously resided one year next preceding the election in that election precinct in the city of Lexington; and had, on the 24th of July, 1857, been naturalized under the act of congress, by the city court of Lexington; all of which was proven to the satisfaction of the judges and the defendant. That the judges differed in opinion as to the plaintiff's right to vote, and the duty devolved upon the defendant, as sheriff, to decide whether he had a right to vote or not, and that the defendant, "knowingly ' and willfully, with the intention unlawfully to de- ' prive said plaintiff of his right to vote, refused to ' receive his vote, and thereby unlawfully prevented ' him from voting."

The defendant filed a demurrer to the plaintiff's petition, assigning for cause—

1. That the petition did not allege facts sufficient to constitute a cause of action.

2. The Lexington city court had no authority to hear applications for, and grant certificates of, naturalization.

3. That the residence of the plaintiff, since he was naturalized, was not sufficient to entitle him to vote.

The circuit court sustained the demurrer, and rendered a judgment against the plaintiff, from which judgment he has appealed to this court.

Can an action be maintained against the judges of an election, or the sheriff when he acts as umpire between them, for deciding erroneously, that a person offering to vote is not a legal or qualified voter? This is the first inquiry that naturally arises in this case, for unless such an action can be maintained the other questions that have been discussed so much

at large, do not come properly before us for our consideration.

It is undoubtedly true, as a general principle, that whenever a right is violated the law provides a remedy for the injury. But this, like all other general rules, is subject to exceptions. From the very nature of a judicial tribunal its action must necessarily be in some degree exempted from the operation of this principle. Every erroneous decision violates some right, and works an injury to some party. But as every human tribunal is liable to err, no judge even of the most inferior one, should be held responsible for a mere error of judgment, committed by him in the regular discharge of the duties of his office. The judges of the election, of whom the sheriff becomes one when the judges disagree, may err in determining upon the legality of a vote offered to be given, and thus reject a voter who is legally entitled to vote, but if the decision was the result of a mere error of judgment, and was not induced by improper motives, no action can be maintained on account of such erroneous decision.

1. No judicial officer, however low his grade as such, is liable to suit for a judicial opinion, however erroneous it may be, if it be not influenced by improper motives. (4 *Bibb*, 28.)

Whilst it is admitted to be essential to the just rights of electors and also of candidates, that the right of suffrage should be freely exercised by the qualified voter, it is equally essential that those who are called by their official duty to preside at elections, and to decide on the qualifications of voters, should be sustained and encouraged, in the faithful and conscientious discharge of their duty.

No action ought then, in principle, to be maintainable, against the judges of an election, whose functions are to some extent judicial, for refusing to receive a vote, without alleging and proving that in so acting they were influenced by bad motives, and decided contrary to their own honest convictions of what was right and proper.

2. No action can be maintained against the "judges of elections, whose functions are to some extent judicial, for refusing to receive a vote, without allegation and proof that they were influenced by bad motives, and

A different rule seems to prevail in the state of Massachusetts, and it has been there settled, in a series of decisions, that an action can be maintained

MORGAN
vs.
DUDLEY.

decided contra-
ry to their own
honest convic-
tions of what
was right and
proper."

against the *selectmen*, who preside at an election, for refusing the vote of a qualified voter, even although they may have exercised an honest and fair judgment on the question before them. (*Kilham vs. Ward*, 2 *Mass.* 236; *Lincoln vs. Hapgood*, 11 *Mass.* 350; *Henshow vs. Foster*, 9 *Pick.* 312.)

This rule seems to have been adopted from an anxious desire to protect and secure the right of suffrage, a right which is invaluable and secured by the constitution; but it should be remembered, that whilst it is essential to the proper operation of the true principles of a representative government that no unnecessary obstructions be thrown in the way of the exercise of the right of suffrage by the qualified voter, it is equally necessary, for the attainment of the same end, that the public officers should be protected and sustained, in denying this right to such unqualified persons as may attempt its usurpation.

3. A sheriff,
whose duty it is
to decide on the
qualification of
voters, when the
two judges dis-
agree in regard
to the qualifica-
tion of voters,
acts judicially.

The judges of an election, as well as the sheriff in deciding between them when they disagree, act judicially in passing upon the qualifications of a voter. And it is well settled, that no action can be supported against any person acting judicially, within the limits of his jurisdiction, though he should act illegally or erroneously, unless he has acted from impure or corrupt motives. (*Gregory vs. Brown*, 4 *Bibb*, 28.) The harmony and analogies of the law will therefore be best preserved by adhering to the general principle, which seems to have been adopted in such cases in England, and in most of the states of this union.

We are of opinion, therefore, that an action can be maintained against the judges of an election, and the sheriff when he acts in the capacity of a judge, for refusing to permit a qualified voter to exercise the right of suffrage; but to sustain the action it is necessary to allege and prove, that the defendant, in deciding that the plaintiff was not entitled to vote, did not act according to his honest conviction of his duty, and of the legal rights of the plaintiff, but act-

ed knowingly wrong, under the influence of impure and corrupt motives.

The petition in this case alleges that the defendant knowingly and willfully, with an unlawful intention, refused to receive the plaintiff's vote. The charge might have been made more explicit, by an averment that the defendant knew that the plaintiff was legally entitled to a vote, and had, notwithstanding such knowledge, wilfully, and from improper motives, refused to receive his vote. Construing, however, the charge as made to be susceptible of this meaning, according to a liberal interpretation of it, the petition may be regarded as sufficient in this respect to enable the plaintiff to maintain his action.

The power of state courts, to naturalize aliens, in the mode prescribed by the acts of congress, is the next question that we are called upon to discuss and consider.

The constitution of the United States, (*article* 1, *section* 8,) gives to congress the power "to establish an uniform rule of naturalization."

The act of congress of 1802, passed in virtue of this power, and entitled, "an act to establish an uni-' form rule of naturalization, and to repeal the acts ' heretofore passed on the subject," designates certain state courts, by which, as well as by the federal courts, the power of admitting foreigners to citizenship may be exercised. The 3*rd section* of the same act, to render certain what state courts were referred to, expressly enacts, "That every court of record ' in any individual state, having common law juris-' diction, and a seal and clerk or prothonotary, shall ' be considered as a district court, within the mean-' ing of this act; and every alien who may have been ' naturalized in any such court shall enjoy, from and ' after the passage of the act, the same rights and ' privileges as if he had been naturalized in a dis-' trict or circuit court of the United States."

It is not controverted that the process of naturalization, in the mode it is required to be performed by

MORGAN
*vs.*
DUDLEY.

4. The allegation in a petition against a sheriff who refused to permit the plaintiff to vote when he had a right to vote, "that the defend't knowingly and wilfully, with an unlawful intention, refused to receive the plaintiff's vote" shows a good cause of action.

5. The act of naturalization,

MORGAN
*vs.*
DUDLEY.

as it is required to be performed by the act of congress, is a judicial act — (*Spratt v. Spratt* 4 *Peters*, 393,) and congress cannot authoritatively confer jurisdiction on state courts, or compel its exercise. (*Huston vs Moore*, 5 *Wheaton*, 27, which was a criminal case. *Haney vs. Sharp*, 1 *Dana*, 442.)

the act of congress, is a judicial act. It was decided, in the case of *Spratt vs. Spratt*, 4 *Peters*, 393, to be of that character, and that the admission to citizenship, when entered of record, furnished complete evidence that the requisitions of the act of congress had been complied with. Nor will it be contended that congress can *authoritatively* bestow judicial powers on state courts. In the case of *Huston vs. Moore*, 5 *Wheaton*, 27, it was "held to be perfectly clear, that ' congress cannot confer jurisdiction upon any courts, ' but such as exist under the constitution and laws of ' the United States, although the state courts may ex-' ercise jurisdiction in cases authorized by the laws ' of the state, and not prohibited by the exclusive ' jurisdiction of the federal courts." The jurisdiction referred to related to criminal cases, and in such cases it seems to be conceded that every government must execute its own penal and criminal laws, and cannot confer any jurisdiction upon the courts of other states for that purpose. It was upon this principle that the case of *Haney vs. Sharp*, (1 *Dana*, 442,) was decided, this court denying the jurisdiction of the state courts, in that case, upon the ground that every government has an exclusive right to enforce its own penal laws. The supreme court of New York, in the case of the *United States vs. Dodge*, (14 *Johns. Rep.* 95,) held that they had jurisdiction, and sustained a suit on a bond for duties given to a collector of the United States' customs, under the judiciary act of 1789, giving concurrent jurisdiction to the state courts, in suits at common law, where the United States were plaintiffs. But the same court in the case of the *United States vs. Lathrop*, (17 *Johns. Rep.* 4,) subsequently decided, that a state court had no jurisdiction of an action in favor of the United States to recover a penalty for a breach of a law of the United States, although the act of congress made it cognizable in a state court.

6. The authorities on the sub-

The conclusion that seems to be warranted by all the decisions on the subject is, that in judicial mat-

ters the concurrent jurisdiction of the state courts, depends altogether upon the pleasure of congress, in every case in which the subject matter can constitutionally be made cognizable in the federal courts; and that the state courts will, in *civil actions*, unless prohibited, retain a concurrent jurisdiction in all cases where they had jurisdiction originally over the subject matter. (1 *vol. Kent's Com. side page*, 400.)

When, however, we admit that congress cannot *authoritatively* confer judicial powers on state courts, we only mean that congress cannot compel them to entertain jurisdiction in any case, or to perform any judicial act. But we do not mean that congress cannot empower them to perform any judicial act, to which they are competent, and for the performance of which they have an adequate inherent jurisdiction. The argument which denies to state tribunals the power to perform the process of naturalization erroneously assumes, for its premises, that the performance of that act renders it necessary for them to be invested with some jurisdiction in addition to that which they already possess. This, however, is an evident mistake, and hence the fallacy of all the reasoning that is based upon such an erroneous assumption.

Any court of record, having *common law* jurisdiction, is fully adequate to the performance of every thing required to be done, in the process of naturalization, as prescribed by the act of congress. Such a court can swear witnesses, and determine whether the applicant has resided within the United States five years, and during that time he has behaved as a man of good moral character, attached to the principles of the constitution of the United States, and well disposed to the good order and happiness of the same, and then administer to him the oath of allegiance and naturalization; and being a court of record, it can require all the proceedings to be duly recorded. The act of congress expressly declares that every alien thus naturalized shall be a citizen of

ject of jurisdiction conferred on state courts by congress, seem to be "that in judicial matters, the concurrent jurisdiction of the state courts depend upon the pleasure of congress in every case in which the subject matter can constitutionally be made cognizable in the federal courts, and that the state courts will, in *civil actions*, unless prohibited, retain a concurrent jurisdiction in all cases where they had jurisdiction originally over the subject matter. (1 *Kent's Com. side page* 400.)

7. Although congress cannot compel state courts to exercise a jurisdiction which it may confer, and for the performance of which they have an adequate inherent jurisdiction, yet if the state courts do exercise the power, it is a valid act.

8. Every *court of record,* whether of a state or of the U. States, having *common law jurisdiction,* is fully compe tent to perform every act which is necessary to be done in the process of naturalization. As

state courts may authorize the officers of other states to do certain acts, as taking depositions, &c. which, when done in conformity with the power conferred, is valid.

the United States. As the subject is one over which congress has the exclusive control and power, and has therefore the right to declare what act shall constitute an alien a citizen of the United States, it may well be doubted whether the effect of the act, when performed in the manner congress has prescribed, could be called in question, on the ground that the tribunal which is empowered to do the act, has not the necessary jurisdiction, even if it had no other power than that conferred upon it by the act of congress. The legislature of any state can enact laws, by which foreign tribunals and magistrates will be empowered to do certain acts which, when performed in the manner prescribed by the law, will be valid and effectual for every purpose. Thus depositions are taken by, and deeds acknowledged or proved before, certain officers residing in other states, and in foreign countries. The legislature of Kentucky cannot confer any jurisdiction upon a court or magistrate in another state, yet it can empower one to hear proof of the execution of a deed, and to decide whether it has been executed by the grantor, and the other to take and certify depositions, and can make both acts valid when performed. The deed thus proved before a court in another state, and certified according to law, will be sufficient to pass the title to any land embraced by it within the limits of the state, and the depositions thus taken by a non-resident magistrate are admissible as evidence in any court in this state, in which they have been taken to be used. These acts derive all their efficacy and validity from the act of the legislature which authorizes their performance, the subject matter being one over which the legislature of the state has exclusive power. Why then cannot congress, where it has exclusive power over the subject matter, authorize a state tribunal to perform an act, and impart to it, when done, as much validity as is given to similar acts performed by foreign tribunals, when authorized by state legislation? The only reason

assigned is, that congress has prescribed a mode of naturalization which makes it a judicial act, and therefore, unless it can confer the necessary jurisdiction, a state tribunal has no power to perform the act. The same course of reasoning would render invalid all the acts referred to which are authorized by state legislation. The state of Kentucky cannot confer the power on a magistrate in another state, lawfully to administer an oath to a witness, called upon to depose in an action pending in this state. But does that render the testimony of the witness inadmissible? Cannot the legislature of this state impart, by law, the same validity to the testimony thus taken that it would have if taken by one of our own magistrates in our own state? If so, congress has certainly the same power to impart validity to an act which it authorizes a state tribunal to perform, although it may assume the form of a judicial act. Congress has the exclusive power to appoint the mode in which a foreigner shall be naturalized, and having done so, the act of naturalization, when performed by a state tribunal, in the mode prescribed, has the same effect given to it that it is entitled to when performed by a court of the United States. If congress had authorized the clerk of any state court, that is a court of record, to naturalize an alien, then, according to the argument relied upon, the act of naturalization, when thus performed, being merely ministerial, would have been legal and valid. But having authorized it to be done by the court itself, and not by its clerk, it is made a judicial act, and for that reason becomes illegal and invalid. The act of naturalization, however, when performed either by the clerk or the court, would derive all its effect from the act of congress, and would be equally valid whether performed by one or by the other.

But as before remarked, such state tribunals as are designated by the act of congress have an original and inherent jurisdiction, fully adequate to the performance of every act required in the process of

MORGAN
vs.
DUDLEY.

naturalization according to the mode prescribed; and no increase of jurisdiction is necessary to enable them to act judicially upon the subject.

Kent, in his Commentaries, (*vol.* 1, *side page* 397,) says: "State courts may, in the exercise of their or- 'dinary, original and rightful jurisdiction, inciden- 'tally take cognizance of cases arising under the 'constitution, the laws, and treaties of the United 'States." This is the true principle upon which the jurisdiction is exercised; not upon the ground of a judicial authority conferred as such, by a law of the United States, but as the ordinary jurisdiction of the state court. Upon this principle it was decided by the supreme court of Massachusetts, in the case of *Ward vs. Jenkins and others,* (10 *Metcalfe,* 583,) which was a suit by the assignee of a bankrupt, under the United States bankrupt act of 1841, that if a case be within the ordinary jurisdiction of a state court, the court may take cognizance of it, though the cause of action arises under rights acquired by a statute of the United States. And upon the same principle, the supreme court of Alabama, in the case of *Giller vs. Herndon,* decided that the state courts had cognizance, concurrently with the federal courts, of cases of fraud in a bankrupt's discharge under the act of congress. The same principle was recognized in the case of *Wallace vs. McConnell,* (13 *Peters' U. S. R.* 136,) in which it was held that an attachment commenced and conducted to a conclusion in a state court, before the institution of a suit against the debtor in a federal court, was a good defense to the action. And the jurisdiction of our own state courts, concurrently with the federal courts, of cases of fraud in a bankrupt's discharge, has been frequently recognized in this court, and was never doubted. All these cases were regarded as being embraced by the ordinary jurisdiction of the state courts, and were taken cognizance of by them for that reason. As this ordinary jurisdiction is sufficient to enable the state courts to decide controver-

sies between individuals, in relation to matters arising under the laws of the United States, why is it not sufficient to enable them to perform a judicial act, which is an *ex parte* proceeding, in which the rights of adverse parties are not in any manner involved, and which is expressly authorized by the act of congress?

But it seems to us that this question ought now to be considered as settled, even if it were much more doubtful than it is, after the power has been exercised by the state courts, without objection, for more than half a century. We have not heard of, nor have we been referred to, a single decision prior to the present one, in which it was adjudged by any court that the power could not be rightfully exercised. This universal acquiescence in its exercise for so long a period of time, is a potent argument in favor of the conclusion, that the jurisdiction assumed by the state courts is rightful, and not a mere usurpation of illegal power.

This jurisdiction, however, has not only been exercised for so long a period without objection, but its legality has been repeatedly recognized and treated as if it were unquestionable. In the cases of *Campbell vs. Gorden and wife*, (6 *Cranch's Rep.* 176.) and of *Starke vs. Chesapeake In. Co.* (7 *Cranch*, 420.) persons naturalized by state courts were adjudged to be citizens of the United States. No question was made in either case as to the power of the state courts, to naturalize; *that* seems to have been conceded, not however as is supposed on the ground of an antecedent jurisdiction, for there was nothing in either case which showed the existence of any such jurisdiction, it must therefore have been, on the ground that their ordinary and inherent powers, as courts of common law jurisdiction, were deemed sufficient to enable them to perform the act.

The jurisdiction of *state* courts, in such cases, was tacitly recognized in the state of Virginia in the

9. The fact that state courts have for a long period of time exercised the power of naturalization is a strong argument in favor of its exercise, especially as its legality has been repeatedly recognized — (*Campbell vs. Gordon & wife*, 6 *Cranch*, 176; *Starke vs. Chesapeake In. Co.*, 7 *Cranch*, 420,) in which persons naturalized were adjudged to be citizens. (5 *Leigh*, 740; 1 *Hill*, 141; 18 *Barbour* 444; 5 *English*, *Ark. Rep.* 621.)

case of the *Commonwealth vs. Towles*, (5 *Leigh*, 743;) in the state of New York in the cases of, *Ex parte Granstein*, (1 *Hill*, 141,) and John Clark's case, (18 *Barbour*, 444,) and also in several other states; in none of which cases was the jurisdiction of the state courts called in question. But the question does appear to have been made and expressly decided by the supreme court of Arkansas, in the case of the *State vs. Penny*, (5 *English*, 621,) in which the court says, " there can be no doubt as to the rightful juris-' diction of the state courts in such cases, until extin-' guished by some act of congress, and such appears. ' to have been the universal understanding upon this ' point."

Even those who contend that state courts have no power to naturalize foreigners concede that the state legislatures can confer upon them the power to do it. They insist, however, that an express delegation of power is necessary, and in this we conceive consists the error of the whole argument on the subject. They seem to forget that the state, in the very creation of such courts as are designated by the act of congress, confer upon them all the jurisdiction that is necessary to enable them to perform, judicially, the act of naturalization—that it is a part of their inherent and ordinary jurisdiction, resulting from the very nature of their organization, and inseparably incident to every court of record and of common law jurisdiction, unless its exercise be restrained or prohibited by the power by which the court is created. It is by the exercise of this ordinary jurisdiction that such courts are enabled to take cognizance of actions brought by assignees in bankruptcy, who derive all their rights under the laws of the United States, as well as in all the cases before mentioned. If this ordinary jurisdiction is sufficient to enable

10. Such state courts as are designated by the act of congress have the power to naturalize

such courts, without any express delegation of power by the state legislatures, to take cognizance of these cases, why should the power to naturalize under the act of congress form an exception to this principle,

MORGAN
*vs.*
DUDLEY.

foreigners un-
der that act of
congress, and
are so recogniz-
ed by our *Re-
vised Stat. page*
172.

and require an express grant of jurisdiction to authorize it to be done? We are not able ourselves to imagine any plausible reason for such a distinction, nor were we furnished with any in the argument of the cause. We are therefore brought to the conclusion that such state courts as are designated in the act of congress have power to naturalize foreigners under that act. Indeed, their authority to do so has been impliedly recognized by our own legislature, in that part of the Revised Statutes, (*page* 172.) which declares what persons shall be deemed citizens of this state: " All free white persons, natural-
' ized under the laws of the United States, who may
' be or become residents of this state," shall be deemed citizens thereof. How naturalized under the laws of the United States? Of course in the mode and by the courts pointed out by those laws. Thus the acts of naturalization performed by the state courts are expressly legalized by the legislature, and the authority of such courts to naturalize foreigners fully and explicitly recognized.

We do not, as it will be perceived, place the jurisdiction of the state courts on the ground that it has been conferred by the act of congress, although Mr. Justice Story, in delivering the opinion of the supreme court of the United States in the case of *Prigg vs. The Commonwealth of Pennsylvania,* (16 *Peters,* 622,) says, with respect to the right of congress to confer power on the state authorities:

"As to the authority so conferred upon state mag-
' istrates, whilst a difference of opinion has existed
' and may still exist on the point in different states,
' whether state magistrates are *bound* to act under it,
' none is entertained by this court, that state magis-
' trates may, if they chose, exercise that authority
' unless prohibited by state legislation." The authority referred to is evidently that conferred by the United States, for if it were that emanating from the states themselves no question could have arisen, whether state magistrates are *bound* to act under it,

MORGAN
vs.
DUDLEY.

inasmuch as their duty to do so would be plain and imperative. This dictum therefore seems to warrant the conclusion, that the court entertained the opinion that congress can confer jurisdiction upon state courts, which they may exercise, unless prohibited by state legislation.

Nor do we place the validity of the act of naturalization by state courts on the ground that congress having exclusive power over the whole subject, can therefore make it valid as a *naturalization act*, and thus confer citizenship upon a foreigner, whether such courts have jurisdiction to act judicially over the subject matter or not, although very forcible arguments, deduced from both principle and authority, have been urged in favor of both of these positions.

But we place it upon the broad ground, that such state courts as are designated in the act of Congress have an ordinary inherent jurisdiction, under the common law in force in the states, by which they are created, and incident to their very nature and organization, as courts of common law jurisdiction, which enables them to perform judicially the process of naturalization in the mode prescribed by law, and that having been authorized by congress to act judicially on the subject, their acts are as valid as if they were performed by one of the courts of the United States.

The Lexington city court is erected by the act which incorporated the city. It is a court of record, has a clerk and seal, and is vested with limited common law jurisdiction. The act of congress, in designating the state courts that have authority to admit aliens to become citizens of the United States, does not describe them as courts of *general* common law jurisdiction, but as courts having common law jurisdiction, and consequently embracing all that has either *limited* or *general* common law jurisdiction. If a court have no common law jurisdiction it is not embraced by the act, but if it have common law juris-

11. The Lexington city court being a court of record, having a clerk and seal, being vested with a limited common law jurisdiction, has authority to admit aliens to citizenship.

diction it is embraced by it, although its common law jurisdiction may be limited.  Consequently the city court of Lexington has power to naturalize aliens, and the second ground of demurrer to the plaintiff's petition was therefore insufficient and invalid.

The third ground of demurrer involves the construction of the eighth section of the second article of the state constitution, which prescribes the qualifications of electors.   On the part of the plaintiff it is contended, that his residence in the county of Fayette for two years preceding the election, although he was not naturalized until a short time prior thereto, entitled him to a vote.   And on the other side it is contended, that according to the true interpretation and meaning of the constitution, his residence should have continued that length of time after he became a citizen.

The section referred to reads as follows, viz: "Ev-
' ery free white male citizen, of the age of twenty-
' one years, who has resided in the state two years,
' or in the county, town or city, in which he offers to
' vote, one year next preceding the election, shall be
' a voter, but such voter shall have been, for sixty ·
'days next preceding the election, a resident of the
' precinct in which he offers to vote, and he shall vote
' in said precinct, and not elsewhere."

The object of this section is to prescribe and define the qualifications of a voter.   He is the person to whom alone it refers.   To entitle him to a vote he must be a free white male citizen, of the age of twenty-one years; he must have resided in the state two years, or in the county, town, or city, in which he offers to vote, one year next preceding the election. The residence of the person referred to, for the time prescribed, is what is required.   It is not said that his residence shall be *as a* citizen, or in that character, or that it shall be continued any length of time after he becomes a citizen.

But it is argued that according to the language used, it is only *the citizen*, who has resided the time

mentioned, who thereby becomes qualified to vote, and that unless he has resided during that time, *as a citizen*, he has not complied with the terms prescribed; that *the citizen*, in his character of citizen, is the person referred to in the section, who must reside the time required, and consequently his residence *as a citizen* is necessary to his qualification as a voter.

The language may be susceptible of this construction, and it is argued that such is its meaning according to its strict grammatical interpretation. But if it be, it is evidently not its natural or ordinary meaning, nor one that would occur to the common or unlearned reader; on the contrary, it is strained and obscure, and can only be reached by a close analitical examination of the different parts of the whole sentence.

The term citizen is manifestly used in this section, as descriptive of the person who is entitled to vote, and not to designate the nature or character of his residence. If the expression "who has resided" applies to the citizen as such, and requires a residence by him *as a citizen*, why does it not also apply to the whole of the preceding part of the sentence? It would then read, when thus construed, that every free white male citizen, of the age of twenty-one years, who, *as such*—that is, *as a citizen* of *the age* aforesaid—has resided the time mentioned, shall be a voter. It would seem, to apply as well to the age as to the citizenship of the person referred to, and the language used will not justify the making of any distinction between them. One of the consequences therefore of the construction contended for, when fully carried out, would be to exclude all persons from the polls, who have attained the age of twenty-one, until their residence shall be subsequently continued the length of time required by the section—a consequence never contemplated nor intended by the framers of the constitution.

12. Foreigners who have resi-

The plain and literal signification of this part of the constitution is, in our opinion, entirely consistent

with its evident object and design, that is, to point out the qualifications necessary to entitle a person to a vote. He must be a white citizen of the age of twenty-one at the time he offers to vote, and must have previously resided in the state and precinct the prescribed time, and no other positive qualification is necessary. It does not require a residence after he becomes a citizen, or after he attains the age of twenty-one, but only a previous residence next preceding the election, either before or after he acquires citizenship or attains majority.

If any doubt could exist as to its true meaning there are some considerations which it seems to us must effectually silence and remove all doubt upon the subject.

The former constitution of this state, which was adopted on the 17th day of August, 1799, contained the following provision, viz:

"Every free male citizen, (negroes, mulattoes, 'and Indians excepted,) who at the time being hath 'attained to the age of twenty-one years, and resi-'ded in the state two years, or the county or town 'in which he offers to vote, one year next preceding 'the election, shall enjoy the right of an elector."

It will be readily perceived that so far as the present question is concerned there is no substantial difference between this provision and the one on the same subject, which is contained in the new constitution.

The construction of this part of the former constitution was firmly settled by an uniform practice of half a century. The alien who had resided in the state the requisite time was permitted to vote immediately after he became a citizen. His right to do so was never questioned. It was universally conceded, and thus, by general concurrence, the true meaning of the language used in the constitution, in relation to the qualification of electors, was clearly and unequivocally defined. The practice referred to constitutes a part of the history of the state, and

MORGAN
vs.
DUDLEY.

ded in the state, county, and precinct the length of time required by the constitution, are entitled to vote immediately upon being naturalized.

MORGAN
vs.
DUDLEY.

as such may be judicially noticed by this court. This construction was also concurred in by the legislature, as is proved by its enactments on the subject of illegal voting. A penalty was denounced by statute on a person who should vote who was not a citizen, or who had not resided in the state two years, or in the county where he offered to vote one year next preceding the election, or who had not attained the age of twenty-one years, or who was not a resident of the state, or who resided in another county, but no fine was imposed on a naturalized citizen for voting before he had resided in the state two years, or in the county one year, after he became a citizen.

The framers of the new constitution must be presumed to have known what construction this part of the former constitution had received, and when they adopted the same provision, substantially, as a part of the new constitution, they must have intended that it should have the same meaning and operation which it had under the former. This conclusion would seem to be irresistible, for if any alteration had been desired or contemplated by them, on this subject, they would have made such a change in the language they used as would have clearly indicated such an intention. Their omission to do this removes all doubt on this point, and conclusively demonstrates that their intention was, by retaining the same language which was used in the former constitution, to adhere to the practice which had so long and uniformly prevailed under it.

It is a well established rule of construction, the wisdom of which has been justified by experience, that when the meaning of any one provision of an instrument is obscure, uncertain, or ambiguous, other parts of the same instrument may be resorted to, for its illustration, and for the purpose of explaining the ambiguity. If, then, the meaning of the section of the constitution in question were doubtful, we find other provisions in the same instrument, on kin-

dred subjects, the consideration of which would have the effect of dispelling every doubt, and would clearly prove that the construction contended for, on the part of the plaintiff, is correct.

The constitution in prescribing the qualifications of members of the house of representatives, of senators, and even of the governor of the state, only requires that they shall be citizens of the United States at the time of their election. In other respects they are required to have higher qualifications than the electors. Would it not be a singular anomaly in the organization of a government, if the voter should not be qualified to exercise the right of suffrage, and yet would be qualified to be a member of the legislature, a senator, or the governor of the commonwealth? Can it be supposed, that the framers of the constitution intended to bring about such a result? Should not such a construction, therefore, be put upon the language used, in defining the qualfications of a voter, as would avoid such an absurdity? Does not the language used in prescribing the qualifications of the persons to be elected, which is clear and explicit, and only requires that they shall be citizens of the United States, at the time they are elected, remove all doubt as to the true meaning of the language which prescribes a similar qualification, on the part of the electors?

The construction we put upon this part of the constitution is therefore sustained by that which was given to a similar clause in the former constitution, and universally acquiesced in as being correct, as well as by the analogies which exist between this and other parts of the same instrument, and the reasons and conclusions deducible therefrom.

We are therefore unanimously of the opinion, upon the questions arising upon the demurrer, that the law was for the plaintiff, and that the circuit court erred in rendering a judgment for the defendant.

Wherefore, the judgment is *reversed*, and cause remanded with directions to overrule the demurrer

WEAVER, &c.
  vs.
BRACKEN CO'TY
  COURT.

to the plaintiff's petition, and for further proceedings consistent with this opinion.